# EXHIBIT G

# Appendix 4

**Testimony of Dr. Hayne in <u>State v. Brewer</u>**

1          BY THE COURT:  You may proceed.

2          BY MR. ALLGOOD:  If I can have the Court's

3     indulgence just for a minute.

4  DIRECT EXAMINATION BY MR. ALLGOOD:

5     Q.    Would you state your name please for the ladies and

6  gentlemen of the jury, please, sir?

7     A.    Steven Timothy Hayne.

8     Q.    And what is your occupation?

9     A.    I'm a physician who practices in the fields of anatomic,

10  clinical and forensic pathology.

11     Q.    And how long have you been so engaged in that practice,

12  Doctor?

13     A.    For approximately twenty years.

14     Q.    And, Doctor, if you would, give the--the ladies and

15  gentlemen of the jury the benefit of your training and experience

16  in the field of that, uh, endeavor we call forensic pathology.

17     A.    I, uh, graduated, uh, from medical school at Brown

18  University; then, uh, went to, uh, Presidio San Francisco at

19  Letterman Army Medical Center for training in pathology with

20  rotations, uh, at different hospitals, uh, as well as the medical

21  examiner's officer for the city and county of San Francisco.

22  Subsequently, uh, leaving that, uh, training program going to both

23  Fort Leavenworth and Fort Campbell where I served as chief of

24  pathology and post medical examiner for those two, uh, installa-

25  tions, and then, uh, I spent two years in Alabama, uh, working as

26  a reference pathologist, and then came to Mississippi where I've

27  been on the list as a designated pathologist; I've also served as

28  the, uh--the state medical examiner for the State of Mississippi.

29     Q.    Doctor, if you would, how many times have you had the

Hayne - Direct Examination by Mr. Allgood                486

1   occasion to perform, uh, I guess you'd say forensic examinations

2   upon, uh, bodies which have been submitted to you for analysis?

3       A.   In--in--

4       Q.   Ballpark figure.

5       A.   In the range of six to seven thousand times.

6       Q.   And, Doctor, how many times have you been qualified as an

7   expert in the field of forensic pathology either in the courts of

8   this state or any other state or any other jurisdiction for that

9   matter?

10      A.   Approximately three hundred and fifty to four hundred

11  times.

12      Q.   And where are you currently employed and what are you

13  currently doing in terms of an occupation?

14      A.   I'm the senior pathologist at Rankin Medical Center; I'm

15  also on the staff at the University of Mississippi Medical Center;

16  I'm the, uh, medical director of the Kidney Care Laboratories; I'm

17  also the medical director of the Rankin County Morgue.   I'm a

18  designated pathologist, uh, for the Mississippi State Medical

19  Examiner's Office; and I also hold staff positions at other

20  hospitals.

21           BY MR. ALLGOOD:  If your Honor please, we would

22           tender Doctor Hayne at this particular point in time

23           as an expert in the field of forensic pathology.

24           BY THE COURT:  Any voir dire on qualifications?

25           BY MR. WALTERS:  No, your Honor.

26           BY THE COURT:  He'll be accepted as an expert in

27           the field of medicine specializing in the field of

28           forensic pathology.

29           BY MR. ALLGOOD:  Thank you, your Honor.

1            BY THE COURT:  You may proceed.

2       Q.   Doctor, if--if--if you would, first of all, tell us what

3   exactly is a forensic pathologist.  Explain for us what that is,

4   please.

5       A.   A forensic pathologist is a person, uh, who is trained

6   basically in the fields of pathology and, uh--and forensic

7   pathology as a subspecialty, and his basic task, uh, among, uh,

8   many tasks, but the basic task is to come to a conclusion as to the

9   cause and manner of death of an individual.  The cause of death is

10  the medical reason the person died whether it be from a gunshot

11  wound or cancer, a motor vehicle crash, or one of a myriad of

12  possibilities.  The manner of death, however, can only be one of

13  six possibilities, and those include homicide, suicide, accident,

14  natural and in some cases pending till additional information is

15  gathered, and in rare cases undetermined when one cannot come to a

16  conclusion.

17      Q.   And--

18      A.   This usually requires an--an autopsy or postmortem

19  examination but not always.

20      Q.   How do you go about and I think you presaged my next

21  question--how do you go about making a determination in that

22  respect; what--what steps, procedures do you follow; what's the

23  generally accepted tool, if you will, of the forensic pathologist?

24      A.   The most common tool and one of the most useful tools of

25  course is a, uh, postmortem examination in--in the broad sense, uh,

26  to include toxicology and other studies, uh, when necessary, but

27  the, uh, tool that is most commonly used of course is an autopsy.

28      Q.   Now when you start talking about an autopsy, I think

29  essentially it's done in two steps, would that be correct?

Hayne - Direct Examination by Mr. Allgood                    488

1      A.    There are two basic steps as well as, uh, preceding and

2    intervening steps as well concluding steps, but there are two basic

3    components to an autopsy.

4      Q.    And those two components are what, Doctor, if you would,

5    please?

6      A.    Uh, an internal and an external examination.

7      Q.    Now insofar as, uh, the scientific community is con-

8    cerned, is in fact those two steps, the internal and external

9    examination of the body, uh, in a autopsy scenario, is it in fact

10   generally accepted as being conclusive for the determination of

11   cause of death?

12     A.    It usually is in the vast preponderance of the cases,

13   though in some cases additional studies must be initiated and

14   completed before a cause and manner of death can be, uh, deter-

15   mined.

16     Q.    Now, Doctor, in this particular case, on May ninth,

17   nineteen hundred and ninety-two, did you have the occasion to

18   examine the body of Christine Jackson?

19     A.    I did, sir.

20     Q.    Doctor, first of all, if you would, how was the body

21   attired when you first--

22     A.    The body was--

23     Q.    --saw her?

24     A.    --clothed, uh, with a pair of panties, pants and a shirt.

25     Q.    All right.  Insofar as the--the, uh, article of clothing

26   that you, uh, remarked on this particular child, what did you do

27   with those articles of clothing?

28     A.    The clothing was dried, secured, transported to the

29   Mississippi State Crime Lab on a chain of custody for analysis.

1        BY MR. ALLGOOD:  May I approach the witness, your

2        Honor?

3            BY THE COURT:  You may.

4            (BAGS SHOWN TO DEFENSE COUNSEL)

5        Q.  I'm going to hand you two sets of sacks, Doctor, and ask

6   if you would to open those up and examine them and tell us if you

7   can identify those for us, please.  Would you like some rubber

8   gloves, Doctor, before you open those?

9        A.  I think I can open this one.  (Witness opens bags)  Yes,

10  sir.

11       Q.  What are those, Doctor?

12       A.  First, there are two paper bags and the bags are from an

13  RSVK-1111 sexual assault kit for contact clothing and non-contact

14  clothing, uh, and in, uh, the larger bag the, uh, shirts--shirt

15  and, uh, uh, pants are located; uh, in the, uh, smaller bag, uh,

16  panties are located.

17       Q.  Those are in fact the clothing articles which were on the

18  body of Christine Jackson when you first observed it on May ninth,

19  nineteen hundred and ninety-two, is that correct?

20       A.  That's correct, sir.

21           BY MR. ALLGOOD:  If your Honor please, we would

22           tender these as exhibits to this witness's testimony

23           at this time.

24           BY MR. WALTERS:  No objection, your Honor.

25           BY THE COURT:  Let them be received and marked.

26           Do you want them separate exhibits?

27           BY MR. ALLGOOD:  If your Honor please, yes, sir.

28           BY THE COURT:  Mark them separately, court

29           reporter.

1                    (COURT REPORTER MARKS BROWN BAG CONTAINING PANTIES

2          OF VICTIM AS STATE'S EXHIBIT NUMBER 5 IN EVIDENCE)

3                    (COURT REPORTER MARKS BROWN BAG CONTAINING SHIRT AND.

4          PANTS OF VICTIM AS STATE'S EXHIBIT NUMBER 6 IN EVIDENCE)

5                  BY THE COURT REPORTER:  Okay.

6                  BY THE COURT:  You may proceed.

7          Q.   Doctor, uh, when in fact you found these--these articles

8     of clothing, where were the panties located, if you would?

9          A.   The--

10         Q.   Consult your--your--your report, if necessary, but where

11    were the panties actually located on the child?

12         A.   As I remember they were on the body, and they were, uh,

13    folded in the, uh, pocket of the pants.

14         Q.   Now, Doctor, that's the condition you received them at,

15    right, the--the--the panties were folded in the pocket of the

16    pants, is that correct?

17         A.   Yes, sir.

18         Q.   Now, Doctor, insofar as the actual dimensions of

19    Christine Jackson, how--how tall or long, if you will, was

20    Christine Jackson?

21         A.   Thirty-nine inches, sir.

22         Q.   And how much did Christine Jackson weigh?

23         A.   Approximately forty-five pounds.

24         Q.   Having made those I guess initial observations, did you

25    in fact at that point proceed to your external examination of her

26    body?

27         A.   I did, sir.

28         Q.   And what did you note when you began, uh, examining the

29    body just on the outside, grossly I think is the term y'all use

1   which means the--the big picture, so to speak.

2        A.   On the external examination there was obvious decomposi-

3   tion to include putrefication and, uh, autolysis, uh, the body was

4   breaking down.  There was, uh, skin slippage, uh, identified over

5   the face, and there was a green discoloration, uh, to the abdomen.

6        Q.   Now when we start talking about skin slippage, first of

7   all, tell the ladies and gentlemen of the jury what that is and

8   what causes it, if you would.

9        A.   After a period of time, uh, from death the skin becomes

10  disattached from the underlying dermis and it will actually slough

11  off, become separate, and, uh, initially it will appear as, uh,

12  bubbling, uh, forming small pockets of fluid underneath commonly,

13  and, uh, those bubbles will break and then, uh, larger pieces of

14  skin will become, uh, uh, separated, uh, from the body itself.

15       Q.   Now you also mentioned two other terms, putrefication and

16  autolysis.  If you would, tell the ladies and gentlemen of the jury

17  what that--those two items are, please, sir.

18       A.   Putrefication is the breakdown of the body by, uh,

19  bacterial, uh, organisms, uh, that are found initially within the

20  body, but also enter the body, uh, externally; they cause, the foul

21  smell as well as predominantly the bloating and production of gas

22  within the body.  Autolysis is the enzymes of the body, itself

23  breaking down the tissue.  They're two different processes, uh,

24  both involved in decomposition.

25       Q.   Insofar as this child was concerned, Doctor, how far

26  advanced were these processes?

27       A.   It was early to moderate.

28       Q.   Now, Doctor, upon examining her--her head area on the

29  outside, what did you remark?

1      A.    That there was skin slippage over the face, but most

2  importantly there was non-circumferential, uh, abrasions or scrapes

3  to the skin, uh, located, uh, about the neck, that is, non-

4  circumferential, they did not go all the way around the neck, and

5  they did not form a furrow around the neck.

6      Q.    All right.  These particular abrasions, first of all,

7  define abrasion for us.  Tell us what an abrasion is, please, sir.

8      A.    An abrasion is a scraping of the skin, uh, usually

9  producing a linear pattern, uh, by scraping the most superficial

10  layer of the skin away.  It does not extend to the point where you

11  have any significant bleeding.

12      Q.    And I believe you've testified that in this particular

13  case there was real no pattern to this, uh, abrasions that you saw,

14  is that correct?

15      A.    There was no pattern that I could identify, either the

16  pattern of a hand, uh, specifically, or the placement of a ligature

17  about the neck.

18      Q.    Insofar as the size of these particular, uh, pattern or--

19  or--or--or wounds that you saw, abrasions that you saw, what size

20  are we talking about, Doctor?

21      A.    They measured slightly less than one inch, uh, up to two

22  two--up to two centimeters.

23      Q.    Doctor, do you have an opinion based on the training and

24  experience in your field to a reasonable certainty as to what those

25  abrasions represented on the neck of this child?

26      A.    They represented the application of force on the neck

27  while the child was alive.

28      Q.    Now, Doctor, uh, you have said one thing, uh, at that

29  point that--that, uh, is--is something that's important for us to

1   develop, and that is you said while the child was alive.  Explain

2   for the ladies and gentlemen of the jury why and how you can tell

3   that the child was alive when this force was applied.

4       A.    That determination was made on internal examination of

5   the neck and that there was hemorrhage or bleeding to involve the

6   strap muscles, the sternocleidomastoid muscles that connect the jaw

7   with the, uh, clavicle, uh, the bone running across the upper part

8   of the chest.

9       Q.    When we start talking about hemorrhaging, how does that--

10  and bleeding, how does that indicate that someone was alive when

11  the wound was administered?   Explain that for the ladies and

12  gentlemen of the jury.

13·     A.    It would indicate that there is active blood pressure,

14  and when there is active blood pressure that is one of the

15  definitions of life.  There are many definitions of life, but one

16  of them is that there's active blood pressure, that there is--the

17  heart is beating, and in this case there was injury to the, uh, uh,

18  small blood vessels, uh, of the, uh--of the neck to involve the,

19  uh, uh, uh, muscles that are running down the side of the neck, uh,

20  causing them to tear, and then with the blood pressure existing by

21  action of the heart it allowed for bleeding into the, uh, areas of

22  muscle to involve the right and the left sides of the neck.

23      Q.    So without some type of blood pressure, without the heart

24  pumping, so to speak, creating that blood pressure, then there can

25  be no bruising or hemorrhaging, would that be correct?

26      A.    That's correct.  You would have to have two components,

27  one there has to be a tear of the, uh, vessel, and there has to be

28  bleeding.

29      Q.    And insofar as just putting it I guess quantified and in

Hayne - Direct Examination by Mr. Allgood                    494

1    simple terms, you can't bruise a dead body. I think that would be

2    a fair statement to say. Would that be correct?

3         A.   It is essentially difficult and almost impossible to do

4    that.

5         Q.   Insofar--going back to the--to the out--

6         A.   Well we might--might I also add that there was another

7    finding within the neck that confirmed that the abrasions on the

8    anterior surface of the neck were of an antemortem nature, that is,

9    occurring before, uh, uh, a death. That is specifically on gross

10   examination, there was an area suggestive of bleeding underneath

11   the voice box, on the lining of the voice box that subsequently on

12   microscopic   evaluation   revealed   that   there   was   bleeding   or

13   hemorrhage at that site giving additional information that, uh,

14   when the injuries occurred to the outside surface of the neck, the

15   child was alive.

16        Q.   Now  insofar  as  going  back  to  the--to  the  external

17   examination for awhile yet, uh, on the right upper extremity, that

18   portion we call the right upper extremity which I believe is hands,

19   uh, forearm, shoul--up to the shoulder or so, what did you find in

20   your examination of that particular area externally?

21        A.   There were multiple abrasions, scrapes to the skin

22   located on the front lateral and, uh, posterior surfaces of the arm

23   and forearm as well as the hand and focally to involve the digits.

24        Q.   And when we start talking about these abrasions, what

25   sizes are we talking about in these terms?

26        A.   The abrasions located on the back of the left hand

27   measured one point five centimeters, uh, maximally; that would be

28   up to approximately, uh, uh, five-eighths of an inch located on

29   the, uh, uh, back of the, uh, uh, arm as well as the forearm, uh,

1  and on the palmar surface of the hand the abrasions measured up to,

2  uh, one centimeter which would be, uh, slightly greater than three-

3  eighths of an inch.

4      Q.    And, Doctor, what about on the left; what did you find on

5  the left, uh--

6      A.    There were--

7      Q.    --extremity?

8      A.    There were similar abrasions located on similar loca-

9  tions, the backs of the, uh, extremity as well as the front surface

10  of the extremity, uh, and measured, uh, approximately the same size

11  up to, uh, one centimeter, and the equivalent of slightly greater

12  than three-eights of an inch.

13      Q.    Doctor, if you would, tell the ladies and gentlemen of

14  the jury what a defensive posture wound is, please, sir.

15      A.    A defensive posturing injury or wound is a wound, uh,

16  pattern identified on an individual consistent with that individual

17  trying to ward off an attack. Usually it's found over the back of

18  the hand, uh, as well as the, uh, forearm, but may also be found on

19  the palm or front surface of the hand. Uh, they can consist of

20  abrasions, contusions, and sometimes even slash wounds or, uh, uh,

21  other types of injuries.

22      Q.    Doctor, do you have an opinion based on the training and

23  experience in your field to a reasonable certainty as to whether or

24  not these injuries that you observed on both the upper right and

25  the upper left, uh, extremity of Christine Jackson were in fact

26  such injuries, that is, defensive posturing injuries?

27      A.    They would be in part consistent with, uh, defensive

28  posturing injuries.

29      Q.    And consistent with what else, Doctor?

1       A.   Other types of injuries.

2       Q.   Such as?  Describe that for the ladies and gentlemen of

3  the jury, if you would, please, sir.

4       A.   They were subsequently identified, uh, by another expert

5  that was called into this case.

6       Q.   Now, Doctor, insofar as the right lower extremity and the

7  left lower extremity, what did you find on your examination of

8  those areas?

9       A.   Again, there were abrasions or scrapes to the skin

10 located predominantly on the front surfaces of the extremity, uh,

11 located on the thighs, uh, as well as the, uh, lower part of the

12 extremity, and, uh, near the, uh, uh, back of the right knee, and

13 those individually measured up to, uh, approximately two centi-

14 meters which would be, uh, approaching three-quarters of an inch.

15      Q.   Once again, Doctor, are these injuries consistent with

16 that which we have already discussed as, uh, defensive posturing

17 injuries?

18      A.   Those would be less likely to be defensive posturing

19 injuries.  They--they're located in areas that are not commonly

20 associated with defensive posturing injuries in that the--the

21 defensive posturing injuries are commonly found on the backs or the

22 fronts of hands and forearms.

23      Q.   Insofar as these injuries are concerned though, we're

24 talking about the tops and insteps of feet and things of that area,

25 is that correct?

26      A.   Yes, sir.

27      Q.   Doctor, do you have an opinion insofar as a reasonable

28 medical certainty is concerned as to whether or not based on your

29 observations on the exterior of the body of Christine Jackson she

1    in fact was thrashing and fighting as best she could for her life?

2        A.    I do, sir.

3        Q.    And what is--

4                    BY MR. KESLER:  Your Honor, we'll object to the--

5              the--the latter phrasing of that question.

6                    BY THE COURT:  Overruled.  You can answer.

7        Q.    And what is that opinion, Doctor?

8        A.    She was, sir.

9        Q.    Doctor, you--you've already commented on some green

10   discoloration.  Where did you find that green discoloration?

11       A.    That was found over the abdominal wall.

12       Q.    And what was that indicative of?  Explain how that green

13   discoloration got there and--and what that is in fact indicative

14   of.

15       A.    That  is  supportive  of,  uh,  decomposition  change,

16   specifically putrefication; there was the production of sulfhydryl

17   groups by the bacteria in the GI tract after death and sulfhydryl

18   groups, uh, have sulfur in them by definition, and they impinge a

19   green discoloration to anything they come in contact with.  It's

20   indicative of bacteria growing after death, a specific type of

21   bacteria that metabolized sulfur in part and they produce a, uh,

22   distinctive green, uh, color that was found on the decedent's, uh,

23   abdomen.

24       Q.    Doctor, having comple--

25                   BY THE COURT:  Excuse me.  Let me interrupt you

26             just a moment, counsel.  I'm going to take a brief recess

27             here.  We've been going a pretty good while; I'm going

28             to take a brief recess.  We must finish this physician's

29             testimony today, but I do also want to keep the jury's

1          comfort in mind.  I'm going to take a brief recess at

2          this stage.  Should any of you have further messages that

3          you wish to be conveyed, please make notes of that and

4          the bailiffs will tend to it.  I believe that the other

5          messages have already been taken care of to today's date

6          that you've given so far to date.  If there are any other

7          or further messages, please give those at this recess and

8          we will make those calls for you.

9               Doctor, you need not stay on the witness stand

10         during this recess.  You may step down from the witness

11         stand.  Please do not discuss your testimony with anyone

12         or any other witness involved in this case.

13    A.   Yes, your Honor.

14              BY THE COURT:  Thank you.  You may step back in the

15         jury room for a brief recess.

16              BY THE COURT:  (To the witness)  You may step down.

17    A.   Thank you, sir.

18                        (JURY OUT)

19              BY THE COURT:  Court's in recess.  Bailiff, give

20         them something to write with.

21                        (JURY OUT)

22                   * * * * * * * * * *

23    FOLLOWING THE RECESS, ALL MEMBERS OF THE COURT, INCLUDING THE

24    JUDGE,  COURT  REPORTER,  ATTORNEYS,  CLERK,  BAILIFFS,  AND  THE

25    DEFENDANT BEING PRESENT, THE FOLLOWING PROCEEDINGS WERE HAD:

26              BY THE COURT:  Show the jury in, please.

27                        (JURY IN)

28              BY THE COURT:  You may proceed.

29              BY MR. ALLGOOD:  Thank you, your Honor.

1  DIRECT EXAMINATION CONTINUES BY MR. ALLGOOD:

2      Q.   Doctor, proceeding from the external examination to the

3  internal examination, if you would, did you in fact examine the

4  lungs and trachea of this particular child?

5      A.   I did, sir.

6      Q.   And what did you find or more particularly what was the

7  absence of what you found in that particular, uh, examination which

8  proved to be significant?

9      A.   There was the absence of any water within the, uh, upper

10 respiratory tree.

11      Q.   And insofar as water, we might as well run that thread

12 out.  What about in the stomach of this child?

13      A.   There was no water in the stomach.

14      Q.   And insofar as the--the blood was concerned, uh, anywhere

15 in this child did you find any evid--evidence of any clotting?

16      A.   As I remember, I did, sir.

17      Q.   And what about--what about the base of the skull; did you

18 find any hemorrhagings at--at the base of the skull in this

19 particular case?

20      A.   I saw no evidence of hemorrhage to involve the petrous

21 ridges.

22      Q.   Now when I start talking about all of those things that

23 I've just mentioned here before this jury, what are those all

24 indicative of?

25      A.   When there is water in the trachea, water in the stomach,

26 clotting the blood, hemorrhage in the--over the petrous ridges as

27 well as the presence of Tardieu's spots and petechia over the, uh,

28 different body or--uh, organs, those would be indicative, uh, and

29 highly supportive of fresh water drowning.

1    Q.   And in this particular case did you find any of those

2   such--sort of indicative?

3    A.   No, sir.

4    Q.   And consequently, Doctor, do you have an opinion as to

5   whether or not, uh, this child in fact died of fresh water

6   drowning?

7    A.   I do, sir.

8    Q.   And what is that opinion?

9    A.   The child did not die of fresh water drowning.

10   Q.   Doctor, proceeding on through your, uh, examination on

11  the internal examination, did you in--in fact examine the vaginal

12  area of this child?

13   A.   I did, sir.

14   Q.   Explain for the ladies and gentlemen of the jury what you

15  found upon that examination.

16   A.   On the examination of the vaginal vault there were, uh,

17  uh, contusions that, uh, measured up to approximately one-half inch

18  and they were found on the top, bottom, right and left sides of

19  the, uh, uh, vaginal vault.   In addition on the structure located

20  more towards the outside surface, uh, of the body, uh, the mons--

21  the, uh, labia menorrhea there was a one centimeter contusion; in

22  addition there were lacerations, uh, extending from the vaginal

23  vault.

24   Q.   From the vaginal fault to where, Doctor?

25   A.   They extended, uh, to the rectum and anus essentially

26  forming one large tract instead of two separate, uh, tracts.   The

27  vaginal vault does not dump into the anus and rectum nor does the

28  anus or rectum enter the, uh, vaginal vault, but in this case it

29  formed one, uh, large common chamber secondary to lacerations to

Hayne - Direct Examination by Mr. Allgood

1    the posterior or back side of the vaginal vault.

2        Q.   In other words she had been torn from that vaginal vault

3    all the way to her anal opening?

4        A.   Yes, sir.

5                BY MR. ALLGOOD:  May I approach the witness, your

6            Honor?

7                BY THE COURT:  You may.

8                (PHOTOGRAPHS SHOWN TO DEFENSE ATTORNEYS)

9        Q.   Doctor, I'm going to hand you a series of three photo-

10   graphs and ask if you can identify those for us, please.

11       A.   (Witness examines photographs)  Yes, sir.

12       Q.   What are those, Doctor?

13       A.   They show the buttocks of, uh, the decedent, Christine

14   Jackson, and it also specifically shows me, uh, pulling the

15   buttocks apart and displaying the large laceration that essentially

16   torn a hole, uh, communicating the vaginal vault with the rectum

17   and anus.

18       Q.   Doctor, are those in fact photographs which were taken

19   while you were present?

20       A.   Yes, sir.

21       Q.   And are those photographs in fact a fair and accurate

22   reproduction of those injuries such as you have described here on

23   this witness stand today to the vaginal opening and the anal

24   opening of this child?

25       A.   Yes, sir.

26               BY MR. ALLGOOD:  If your Honor please, we would

27           tender these as exhibits to this witness's testimony

28           as a composite exhibit.

29               BY MR. WALTERS:  No objection, your Honor.

1                       BY THE COURT: Let them be received and marked.

2           Mark them separately?

3                       BY THE COURT REPORTER:  He said composite.

4                       BY THE COURT:  Composite or separately?

5                       BY MR. ALLGOOD:  Composite, your Honor.

6                       BY THE COURT:  Mark them as a composite exhibit.

7                       (COURT REPORTER MARKS THREE PHOTOGRAPHS SHOWING

8           VAGINAL AREA OF VICTIM AS STATE'S EXHIBIT NUMBER

9           7(A-C) IN EVIDENCE)

10                      BY THE COURT REPORTER:  Okay.

11                      BY THE COURT:  You may proceed.

12                      BY MR. ALLGOOD:  Thank you, your Honor.

13      Q.   Doctor, insofar as these, uh, contusions are concerned,

14   you've mentioned contusions to the labia menorrhea and also

15   contusions inside the vaginal vault essentially all the way around.

16   Doctor, contusions are what?  Explain that for the ladies and

17   gentlemen of the jury.

18      A.   They are bruises produced by, uh, tears of, uh, blood

19   vessels underneath the skin or mucosal surface, and in this case

20   these are mucosal surfaces; they look very similar to a skin

21   surface, like inside the mouth that's a mucosal surface, and when

22   there is blood pressure and these, uh, tears to the blood vessels

23   have occurred there will be bleeding, and the bleeding grossly is

24   referred to as a contusion or a bruise.

25      Q.   Obviously then these bruises were administered before the

26   death of the child then, is that correct?

27      A.   Yes, sir.

28      Q.   Doctor, microscopically did you examine any of that

29   mucosal tissue or the submucosal tissue there, uh, to see if there

Hayne - Direct Examination by Mr. Allgood

1  was in fact any hemorrhaging into the--into the tissue there?

2    A.  I did, sir.

3    Q.  What did you find in that regard?

4    A.  There was hemorrhage.

5    Q.  Doctor, uh, do you have an opinion based on the training

6  and experience in your field to a reasonable medical certainty as

7  to whether or not these injuries which you have just described to

8  us, those injuries which are portrayed in those photographs,

9  whether or not they are consistent with the penetration of this

10  particular child's privates by some non-angled ridged object?

11    A.  Yes, I do, sir.

12    Q.  And what would that opinion be, Doctor?

13    A.  She was penetrated by a ridged object, not non-angled,

14  uh, and, uh, not of a ferrous or a similar type, uh, construction.

15    Q.  Would those injuries that you found would they in fact be

16  consistent with forceful penetration by a male penis?

17    A.  They would be, sir.

18    Q.  Doctor, what kind of force are we talking about would it

19  be necessary to create the--the injuries that you have described

20  and are depicted in these particular photographs?

21    A.  A moderate amount of force would produce that type of

22  tearing.

23    Q.  Now, Doctor, uh, you have already in some respects gone

24  into what you found in the neck; however, you did do an internal

25  examination of the neck, is that correct?

26    A.  I did, sir.

27    Q.  You mentioned already that you found some hemorrhaging in

28  the strap muscles, is that correct?

29    A.  That is correct, sir.

1    Q.   Show the ladies and gentlemen of the jury where those

2  strap muscles are, please, sir.

3    A.   May I point them out on myself?

4    Q.   Yes, sir, if you would, please.

5    A.   They are the right and left sternocleidomastoid muscles

6  running from the jaw to the clavicle.

7    Q.   And insofar as, uh, these hem--this hemorrhaging that you

8  found in these particular muscles, what size are we talking about;

9  what kind of--of, uh, injuries are we talking about here?

10    A.   They were multiple and they measured individually

11  approximately, uh, one centimeter which would be slightly less than

12  one-half inch.

13    Q.   Did you do in fact a microscopic study of some of this

14  tissue?

15    A.   I did, sir.

16    Q.   And what did you find in that--

17    A.   There was--

18    Q.   --particular--

19    A.   There was hemorrhage, sir.  There was hemorrhage which is

20  the same as bleeding.

21    Q.   Doctor, likewise did you examine the larynx area, the

22  submucosal area of the larynx there in the throat?

23    A.   I did, sir, both grossly and microscopically.

24    Q.   What did you find upon that examination?

25    A.   The gross examination there were areas suggestive of, uh,

26  bruising or contusions, hemorrhage, bleeding underneath the, uh,

27  uh, mucosal surface; microscopically that was confirmed by the

28  presence of blood outside of the blood vessels indicating that

29  there was bleeding, uh, while the child was alive.

1     Q.   Likewise insofar as the trachea is concerned, did you

2   examine that microscopically also?

3     A.   Yes, sir.

4     Q.   What did you find in that regard?

5     A.   I did not find any significant hemorrhage to involve the

6   trachea.

7     Q.   Now, Doctor, insofar as all of these findings are

8   concerned, uh, do you have an opinion based on the training and

9   experience in your field to a reasonable certainty as what in fact

10  caused the death of Christine Jackson?

11    A.   I do, sir.

12    Q.   And what would that opinion be, Doctor?

13    A.   She was strangled consistent with manual strangulation,

14  not using a ligature, but using a--a hand, uh, which is commonly

15  referred to as garroting.

16    Q.   Insofar as a--you say not using a ligature, if you would

17  tell the ladies and gentlemen of the jury what a ligature is, just

18  so they'll understand.

19    A.   A ligature is an object such as a string, a piece of

20  rope, or a similar object when placed around the neck will leave a

21  different pattern of injury especially on the external surface of

22  the neck, and that is there would be a deep furrow, uh, around the

23  neck, uh, almost always circumferential, uh, though not, uh, in

24  every case, but almost always, and in this case that was not

25  present.

26    Q.   What instead you found was that which was indicative of

27  manual strangulation, is that correct?

28    A.   Yes, sir.

29    Q.   Doctor, uh, you have described in some detail the wounds

1    that you found on, uh, the--the private parts of this particular

2    child. Do you have an opinion based on the training and experience

3    in your field as to how much blood would have been in fact

4    deposited, released, uh, as a result of those particular injuries?

5              BY MR. WALTERS: I would object, your Honor, unless

6              that's couched in the terms to a reasonable degree of

7              medical certainty.

8              BY MR. ALLGOOD: I'll so rephrase it, your Honor.

9    Q.  Based on--on to a reasonable degree of medical certainty,

10   Doctor.

11   A.  There would not be a significant amount of bleeding from

12   that area. Uh, and that would be based upon the extent of bruising

13   to the vaginal vault, uh, indicating that death had occurred, uh,

14   shortly after injury to that area. Uh, in addition, uh, uh, the

15   posturing of the child would, uh, may or may not preclude any--any

16   significant bleeding at all externally.

17   Q.  Now explain that for the ladies and gentlemen of the

18   jury. When you say the posturing of the child may prevent there

19   from being any significant bleeding externally, explain what you

20   mean by that, Doctor, and how that would operate.

21   A.  If the child dies shortly after infliction of an injury

22   and the heart stops pumping, the only way the blood can exude or

23   leak from a cut surface would be gravitational force, and if the

24   area of injury is located above, uh, the gravitational line, the

25   blood--the blood would be pooled in the body itself, but not

26   necessarily be bleeding to any extensive amount externally.

27   Q.  In other words, Doctor, and--and correct me if I'm wrong,

28   but once--once the heart has stopped beating, then a dead body

29   becomes no more than--than a--a jar, if you will, of blood and in

Hayne - Direct Examination by Mr. Allgood

1   order for that blood to pour out, it must be positioned so it can

2   some how or another be drawn out any available holes for it to come

3   out, is that correct?

4        A.   Yes, sir.  You'd have to have two components.  One, there

5   would have to be a loss of integrity of the skin with tears of the

6   vessel, that is, a--a wound through the skin surface, and after

7   death the body would have to be positioned in such a place that the

8   gravitational force would allow for blood to ooze out.

9        Q.   Now, Doctor, uh, there was some other, uh, marks on the

10   child's body which you have also already referred to I believe.  Is

11   that correct?

12        A.   I eluded to them, yes, sir.

13        Q.   Uh, that was, you previously indicated that some of the

14   marks you found on the limbs on the child--of the child on the

15   extremities, uh, you related they could be posturing wounds and

16   then also part other types of wounds.  Is that correct?

17        A.   Yes, sir.

18        Q.   What other types of wounds did they appear to you to be,

19   Doctor?

20        A.   I thought that they were bite wounds, sir.

21        Q.   Now, Doctor, insofar as your opinion in that particular,

22   uh--in that particular area is concerned, Doctor, uh, do you have

23   an opinion based on the training and experience in your field and

24   the--the examination of literally hundreds and thousands of bodies

25   in autopsy scenarios, do you have an opinion to a reasonable

26   medical certainty as whether these marks which you observed on this

27   child's body that you thought might be bite marks, do you have an

28   opinion as to whether or not they were evidence of decomposition

29   and tissue sloughing?

1     A.   I do have an opinion.

2     Q.   And what is that opinion?

3     A.   I do not believe they were, sir.

4     Q.   And, Doctor, likewise having examined thousands of bodies

5  and had I don't how much postmortem experience, Doctor, do you have

6  an opinion based on the training and experience in your field to a

7  reasonable certain degree of certainty whether or not these marks

8  that you found on this child's body that you perceive could very

9  well be bite marks, whether or not they were the result of insect

10  activity?

11               BY MR. WALTERS:  I object, your Honor.

12               BY THE COURT:  Overruled.  He hadn't stated whether

13           he had the opinion or not.

14     Q.   Do you have--

15     A.   Yes, sir.

16     Q.   And what would that opinion be, Doctor?

17     A.   I did not think that they were insect bites.

18     Q.   Doctor, when--when someone uses the term perimortem, what

19  are we talking about; when some--somebody uses a term called

20  perimortem, what are we talking about?

21     A.   Perimortem is, uh, a time frame centered about death.

22  Usually fairly short, it can occur, uh, the time frame from

23  slightly before death, during the death phase itself and slightly

24  after.

25     Q.   If an injury is in fact perimortem, Doctor, if an injury

26  is inflicted at or about time of death, would it be possible for

27  that injury to be evidence of decomposition and tissue sloughing?

28     A.   I'm sorry, sir.  Would it be evident of--

29     Q.   Possible for that injury to also be evidence of decompo-

1    sition and tissue sloughing?

2        A.    The perimortem injury?

3        Q.    Yes, sir.

4        A.    No, sir.

5        Q.    Explain why that cannot be for the ladies and gentlemen

6    of the jury.

7        A.    There has to be a period of time for decomposition to

8    take place.  Uh, in the State of Mississippi even during the, uh,

9    late spring there will be a period of time before, uh, autolysis

10   and putrefication occur to any significant degree.   There'll be

11   other changes before that that I would think they would go through

12   the time frame of perimortem, uh, including before, during and

13   slightly after death, but significant putrefication would not take

14   place certainly for a period of, uh, many hours.   Even in the hot

15   Mississippi sun during the summer, we don't see significant skin

16   sloughing for several hours.

17       Q.    Doctor, insofar as this particular injury that we have

18   already discussed in the vaginal opening and anal opening of this

19   child, what other artifacts would you expect to be found--that's

20   probably a poor term--what other material will you expect to have

21   found at the scene of such an assault as that other than perhaps

22   some blood?

23       A.    There would be several things.  One--uh, one would, as we

24   did, uh, collect evidence for determination of the presence or

25   absence of semen, to include seminal fluid which would be, uh,

26   unlikely in--in a time frame like this, specifically as phosphatase

27   as well as the presence or absence of spermatozoa, sperm itself,

28   and in a--in an injury like this where there is a tear between the,

29   uh, distal large bowel and the vaginal vault, one could expect to

1·  see fecal material within the vaginal vault--

2      Q.    And one would--

3      A.    --stool.

4      Q.    Would it also be your opinion that you would expect to

5   find fecal material at the scene of this assault?

6      A.    One--one could see that and would most likely expect to

7   see that.

8      Q.    Doctor, I believe you also took, uh, an RSVK-4 kit from

9   the body of Christine Jackson, is that correct?

10     A.    I used an RSVK-1111 sexual assault kit, uh, to collect

11  evidence in the usual way.

12           BY MR. ALLGOOD:  May I approach the witness, your

13           Honor?

14           BY THE COURT:  You may.

15           (ITEMS SHOWN TO DEFENSE ATTORNEYS)

16     Q.    I'm handing you a box that has some markings on it.  I'm

17  going to ask you if you would, Doctor, to open it up, examine the

18  contents and tell us if you can, please, sir, what that contains.

19     A.    (Doctor examines box and contents)  It's a standard, uh,

20  RSVK sexual assault kit produced by Roper Supply and within it

21  contains the, uh, normal white manila envelopes, uh, that indicate

22  the specimens that were collected to include vaginal wash, that is,

23  use of normal saline to, uh, collect fluid from the vaginal wash;

24  uh, an external swab of the vaginal area; two vaginal swabs; uh,

25  public combing, but there was no pubic hair; also, uh, pulled head

26  hair; a oral or an anal swab that was taken in this case; and

27  saliva.  The other, uh, uh, specimens to include serology and

28  toxicology were submitted separately.

29     Q.    Doctor, are those in fact the articles which you took

1    from the body of Christine Jackson on that particular day?

2        A.    Yes, sir.

3            BY MR. ALLGOOD:  If your Honor please, we would

4        tender these as exhibits to this witness's testimony

5        at this time.

6            BY MR. WALTERS:  No objection, your Honor.

7            BY THE COURT:  Being no objection, let them be

8        received and marked.  Give the court reporter time to

9        mark them.

10           (COURT REPORTER MARKS SEXUAL ASSAULT KIT FROM

11       VICTIM AS STATE'S EXHIBIT NUMBER 8 IN EVIDENCE)

12           BY THE COURT REPORTER:  Okay.

13           BY THE COURT:  You may proceed.

14           BY MR. ALLGOOD:  If I can have the Court's

15       indulgence just for a minute.  May I approach the

16       witness, your Honor?

17           BY THE COURT:  You may.

18           (ITEMS SHOWN TO DEFENSE ATTORNEYS)

19       Q.    Doctor, you indicated that the serology, the blood, was

20   drawn and kept in two separate containers, is that correct?

21       A.    Yes, sir.  There--there--there are actually three.  Uh,

22   there was a gray, purple and red, uh, top tubes.

23       Q.    I believe at this point all we have is the purple and the

24   red top, is that correct?

25       A.    Yes, sir.

26       Q.    Those are in fact though the same tubes, I believe if

27   you'll examine those and make sure those are in fact the same

28   tubes, which you drew the blood from Christine Jackson from, is

29   that correct?

1    A.    (Witness examines tubes)  That's correct, sir.

2              BY MR. ALLGOOD:  If your Honor please, we would

3         tender these as exhibits to this witness's testimony

4         at this time.

5              BY THE COURT:  There being no objection, let them

6         be received and marked.  Separately?

7              BY MR. ALLGOOD:  As a composite, your Honor; they're

8         stapled together already.

9              BY THE COURT:  They're stapled together; mark them

10        compositely, court reporter.

11             (COURT REPORTER MARKS PLASTIC BAG CONTAINING TWO

12        BLOOD SAMPLES FROM VICTIM AS STATE'S EXHIBIT NUMBER 9 IN

13        EVIDENCE)

14             BY THE COURT REPORTER:  Okay.

15             BY THE COURT:  You may proceed.

16    Q.    Doctor, did you in fact take some photographs of both

17   those clothing articles that have previously been introduced in

18   evidence and those areas of skin slippage and abrasion which you

19   have previously testified to?

20    A.    Yes, sir.

21             BY MR. ALLGOOD:  May I approach the witness, your

22        Honor?

23             BY THE COURT:  You may.

24             (PHOTOGRAPHS SHOWN TO DEFENSE ATTORNEYS)

25    Q.    I'm going to hand you a series of two photographs and ask

26   if you can to identify those for us, please, Doctor.

27    A.    (Witness examines photographs)  That's the clothing of

28   the decedent, Christine Jackson; it's laid out on the, uh,

29   stainless steel autopsy table.

1    Q.   Those are in fact photographs of those articles of

2 clothing as they appeared on the day that you removed from her

3 body, is that correct?

4    A.   Yes, sir.

5         BY MR. ALLGOOD:  If your Honor please, we would

6    tender these two photographs as a composite exhibit to

7    this witness's testimony at this time.

8         BY THE COURT:  Being no objection, let them be

9    received and marked.  Give the court reporter time to

10   mark them.

11        (COURT REPORTER MARKS TWO PHOTOGRAPHS OF CLOTHING

12   OF VICTIM AS STATE'S EXHIBIT NUMBER 10 (A-B) IN EVIDENCE)

13        BY THE COURT REPORTER:  Okay.

14        BY THE COURT:  You may proceed.

15   Q.   Doctor, did you also take some photographs or were you

16 present when some photographs were taken of the body of Christine

17 Jack--Jackson exhibiting that area of skin slippage and also those

18 areas of abrasion patterns that you perceive to be could be bite

19 marks?

20   A.   Yes, sir.

21   Q.   I'm handing you four photographs and ask you if you would

22 to tell us if you can identify those for us, please.

23   A.   (Witness examines photographs)  Yes, sir.

24   Q.   Are those in fact photographs or at least a part of those

25 areas which you have identified for the ladies and gentlemen of the

26 jury?

27   A.   They are, sir.

28   Q.   And are they in fact a fair and accurate representation

29 of those areas as they existed on that day when you photographed

1    them?

2         A.    They are, sir.

3               BY MR. ALLGOOD:  If your Honor please, we would

4         tender this series of four photographs as a composite

5         exhibit to this witness's testimony.

6               BY THE COURT:  Being no objection, let them be

7         received and marked.  Give the court reporter time to

8         mark them.

9               (COURT REPORTER MARKS FOUR PHOTOGRAPHS OF BODY OF

10        VICTIM AS STATE'S EXHIBIT NUMBER 11(A-D) IN EVIDENCE)

11              BY THE COURT REPORTER:  Okay.

12              BY THE COURT:  You may proceed.

13              BY MR. ALLGOOD:  Thank you, your Honor.

14        Q.    Doctor, I believe there was some alcohol found inside the

15   body of Christine Jackson by the state crime lab.

16        A.    Yes, sir.

17        Q.    Would that be unusual under the conditions of this

18   child's body being left out in the, uh, open in the Mississippi

19   environment, as you understand it, for a period of some two to

20   three days?

21        A.    It would not be unexpected at all at a level of zero

22   point O three percent ethyl alcohol in the blood secondary to post-

23   mortem fermentation.

24        Q.    For the benefit of the ladies and gentlemen of the jury,

25   all that alcohol--the presence of that alcohol is indicative of is

26   the fact she was decomposing and the bacteria was forming alcohol

27   inside her body.  Is that correct?

28        A.    That's correct.  It's not necessarily indicative that she

29   had been drinking, but rather more supportive that the body was

1    breaking down.

2           BY MR. ALLGOOD:  I've no further questions, your

3       Honor.

4           BY THE COURT:  Cross examination.

5    CROSS EXAMINATION BY MR. WALTERS:

6       Q.   Doctor Haynes (sic), when Mr. Allgood asked you questions

7    and asked your opinion, he asked you to a reasonable degree of

8    medical certainty.  Why do you couch your opinions in the terms of

9    a reasonable degree of medical certainty?

10      A.   That is the standard for rendering an opinion as a

11   physician in the courtroom.

12      Q.   That is the stan--the generally accepted standard for

13   rendering a professionally scientifically based opinion, is that

14   correct?

15      A.   Yes, sir.

16      Q.   Would you please describe for this jury the differences

17   between antemortem, perimortem and postmortem?

18      A.   Well one, there--you have given two defi--three defini-

19   tions that you requested.  Perimortem would also include late phase

20   antemortem and early phase postmortem.  Antemortem only means that

21   something has occurred prior to death; perimortem means that

22   something has occurred at or about the time of death, can extend

23   slightly into the antemortem, can extend slightly into the

24   postmortem; postmortem indicates, uh, that a finding is present

25   secondary, uh, or after death.

26      Q.   So postmortem is for sure after death, antemortem is for

27   sure before death, and perimortem is kind of that area in there

28   where you can't really be sure, is that right?

29      A.   At or about death.

1      Q.   All right, sir.  Do you have your report, Doctor Haynes,

2  before you?

3      A.   Yes, sir.

4      Q.   Doctor Haynes, if you would please look in there to

5  Section 14--Paragraph 14 or Section 14, whatever you call it, under

6  B.

7      A.   Yes, sir.

8      Q.   Please read Number 2.

9           BY MR. ALLGOOD:  If your Honor please, that is a

10          report that's not in evidence.  I assume he means read

11          it--

12          BY THE COURT:  I assume he means--he's reading it

13          to himself.

14          BY MR. ALLGOOD:  --to himself.

15     Q.   Does that say that the lacerations in the vaginal vault

16  are consistent with antemortem penetration?

17     A.   Yes, sir.

18     Q.   So it was your opinion that those lacerations were before

19  she died, is that correct?

20     A.   Yes, sir.

21     Q.   All right, sir.  You deferred to another expert you

22  referred to in your testimony to Doctor (sic) Allgood about these,

23  uh, possible bite marks.  Who is that other expert that you

24  deferred to?

25     A.   Doctor Michael West.

26     Q.   All right, sir.  Doctor, in Section 9 of your report I

27  believe you stated that special photographic techniques as well as

28  general photographic documentation were performed by Doctor West.

29  What special photographic techniques were performed by Doctor West?

1       A.   As I remember they were alternate light source imaging,

2   but I would defer to Doctor West and his testimony and his report

3   since I was an observer to that aspect of the examination.

4       Q.   All right, sir.   But to your--to your recollection it

5   was--how did you say that again?   I'm sorry; I'm not real familiar

6   with--

7       A.   Alternate light source imaging.

8       Q.   Alternate light source imaging?

9       A.   Yes, sir.

10      Q.   Tell me what--what you know about alternate light source

11  imaging, if you could, please, sir.

12      A.   It is the use of a four hundred and fifty two nanometer

13  blue light with a yellow filter that appears to have an ability to

14  superficially penetrate the skin surface augmenting injury

15  patterns, uh, when visually observed.

16      Q.   All right, sir.   In Section 2 of your report, Doctor

17  Hayne, titled External Examination, you noted a number of what you

18  refer to as abrasions on the body, is that correct?

19      A.   Yes, sir.

20      Q.   And those abrasions ranged in size from one centimeter to

21  two centimeters, is that correct?

22      A.   Yes, sir.

23      Q.   I remember you said it when Mr. Allgood was talking to

24  you, but in inches what's one centimeter about?

25      A.   It takes two point five four, uh, centimeters to equal

26  one inch so one centimeter is the equivalent of slightly greater

27  than three-eighths of an inch.

28      Q.   All right, sir.   Slightly more than three-eighths of an

29  inch would be one centimeter?

1     A.   Yes, sir.

2     Q.   About how long in inches would two centimeters be?

3     A.   That would be approximately three-quarters of an inch.

4     Q.   All right, sir.  And you noted on a drawing of a human

5   outline where these abrasions were, is that correct?

6     A.   Yes.

7     Q.   And do you have a copy of that drawing in your file?

8     A.   Yes, sir.

9               BY MR. WALTERS:  May I approach, your Honor?

10              BY THE COURT:  You may.

11                   (DOCUMENT SHOWN TO MR. ALLGOOD)

12    Q.   Doctor Hayne, I now present to you what I purport to be

13  a exact copy of the anatomical drawing that was produced in your

14  file.  Is that it?

15    A.   Yes, sir.

16              BY MR. WALTERS:  Your Honor, I'd ask that this be

17         entered into evidence as an exhibit to this witness's

18         testimony.

19              BY MR. ALLGOOD:  I don't have any objection, your

20         Honor.

21              BY THE COURT:  Let it be received and marked.  Pass

22         it to the court reporter, please.

23              (COURT REPORTER MARKS DIAGRAM OF BODY OF VICTIM AS

24         AS DEFENDANT'S EXHIBIT NUMBER 12 IN EVIDENCE)

25              BY THE COURT REPORTER:  Okay.

26              BY THE COURT:  You may proceed.

27    Q.   Did Doctor Michael West also prepare a drawing on that

28  same type form and you incorporated that in your report as well?

29    A.   Yes, sir.

Hayne - Cross Examination by Mr. Walters

1        BY MR. WALTERS:  May I approach, your Honor?

2        BY THE COURT:  You may.

3              (DOCUMENT SHOWN TO MR. ALLGOOD)

4    Q.   Doctor Hayne, I now present to you what I purport to be

5    an exact photocopy of the doctor--of the drawing prepared by Doctor

6    West that is contained in your file.  Does that appear to be the

7    same?

8        A.   The photocopy that you have appears to be the same as the

9    photocopy that I have.

10             BY MR. WALTERS:  At this time, your Honor, we'd ask

11       that this be marked as an exhibit to this witness's

12       testimony.

13             BY MR. ALLGOOD:  If your Honor please, Doctor Hay--

14       Doctor West is going to be here.

15           BY THE COURT:  Do you object to that document?

16             BY MR. ALLGOOD:  I--I--I would object, your Honor.

17       I have no objection to be being marked for identification

18       purposes.

19             BY THE COURT:  The objection is sustained.

20             BY MR. WALTERS:  We would ask then that it be marked

21       as--for identification then, your Honor.

22             BY THE COURT:  Pass it to the court reporter.  Court

23       reporter, mark it for identification only.

24             (COURT REPORTER MARKS PHOTOCOPY OF DIAGRAM OF BODY

25       OF VICTIM AS DEFENDANT'S EXHIBIT NUMBER 13 FOR

26       IDENTIFICATION)

27            BY THE COURT REPORTER:  Okay.

28             BY THE COURT:  You may proceed.

29    Q.   Doctor Hayne, this drawing that Doctor West made that's

1   been marked as Defendant's Exhibit 13--excuse me--Defendant's

2   marked for Identification 13, did you take this drawing and

3   incorporate this in your official report?

4       A.   Yes, sir.

5            (MR. KESLER CONFERS WITH MR. WALTERS)

6       Q.   Are you aware of any inaccuracies on that report prepared

7   by Doctor West?

8       A.   There was one statement here says, "Biopsy two, three,

9   sixteen." Now I don't remember biopsies being taken.  I do not

10  have any record.

11      Q.   Did you take a biopsy?

12      A.   I do not remember doing that.  I have no record of that.

13      Q.   Does your report anywhere reflect the taking of a biopsy?

14      A.   It does not, sir.

15      Q.   What is a biopsy?  Please explain to the jury.

16      A.   Biopsy is the excision of, uh, tissue or other objects

17  within the body.

18      Q.   When you do a biopsy do you put it in your report, Doctor

19  Hayne?

20      A.   Yes, sir.

21      Q.   Did you do a biopsy in this case?

22      A.   I do not remember doing that and I have nothing in my

23  report to reflect that.

24           BY MR. WALTERS:   Your Honor, at this time the

25           defense would ask the Court to admonish Doctor Hayne

26           to answer the question yes or no.

27           BY THE COURT:   I believe that the doctor answered

28           your question, counsel.

29           BY MR. WALTERS:  He said he didn't remember, your

1        Honor.

2              BY THE COURT:  That is an answer, counsel.

3              BY MR. WALTERS:  Very well, your Honor.

4        Q.   Doctor Hayne, when you examined this wound pattern on

5   this girl's throat, you saw that there was an external wound

6   pattern, is that correct?

7        A.   Yes, sir.

8        Q.   And you cut down passed the surface where you could see,

9   is that correct?

10       A.   Yes, sir.

11       Q.   And you looked at the muscles underneath there, is that

12  correct?

13       A.   Yes, sir.

14       Q.   Why did you do that?

15       A.   That's part of the normal dissection, uh, in a case like

16  this to dissect the strap muscles of the neck out as well as the

17  thyroid gland, the larynx, the trachea, the corner of the, uh,

18  thyroid cartilage, and the hyoid bone, uh, to gain access to look

19  at the, uh, carotid arter--arteries, the jugular veins as well as

20  the mucosal surface of the upper respiratory tree.

21       Q.   This incision along this--this wound pattern also helped

22  you determine how deep the wound pattern was also, didn't it,

23  whether it was just superficial or whether there was actual

24  bruising down in the muscle?

25       A.   Well when you cut through the muscle when one was

26  specifically looking for bruising to the muscle and that which is

27  part of the, uh, process, yes, it would.

28       Q.   So it would reveal how much force was used and it--and

29  whether or not this was just a superficial injury or whether it was

1   an injury with sufficient force to cause damage to the underlying

2   tissues?

3       A.   Yes, sir.

4       Q.   You--you, uh, examined some of this tissue microscopical-

5   ly too, is that correct?

6       A.   I examined the, uh, strap muscle as well as the, uh, uh,

7   larynx or voice box.

8       Q.   And that is part of the standard operating procedure to

9   determine the depth and the force and why type of wound it was, is

10  that correct?

11      A.   No.  It is--it is not necessarily; in fact many patholo-

12  gists don't perform microscopic examinations, and the--the question

13  that I had as indicated in the original external and internal

14  dissection that when I described the, uh, larynx I used the term

15  what appears to be submucosal contusions, and that was a inconclu-

16  sive description as to possible findings that could only be

17  ascertained, uh, as to the presence or absence microscopic--by

18  microscopic examination, therefore I went to, uh, microscopic

19  examination taking sections of tissue to render a definitive

20  opinion as opposed to an impression, that is, a diagnosis as

21  opposed to an impression, and the microscopic examination did

22  reveal areas of bleeding at that site.  So the--what I observed

23  with my eyes was confirmed, uh, by, uh, sectioning the tissue and

24  looking at it under a microscope.

25      Q.   So by doing the microscopic examination and actually

26  cutting through the muscle that confirmed what you had visually

27  observed, is that correct?

28      A.   No.  Cutting through the larynx where I suspected and I--

29  and I described as apparent, uh, submucosal hemorrhage, that was

1    confirmed microscopically.  The hemorrhages in the neck, uh, to

2    involve the strap muscles, I had definitively stated that was

3    hemorrhage.  In fact the terminology that I used, uh, the right and

4    left strap muscles reveal focal hemorrhage bilaterally, that is, on

5    both sides.    That's a definitive statement, does not require

6    microscopic evaluation of the tissue.   I went ahead and did it

7    anyway since on all autopsies I take tissue and look at it which is

8    not the normal standard for a forensic autopsy.

9                    BY MR. WALTERS:  The Court's indulgence a moment,

10              your Honor.

11                  (MR. WALTERS CONFERS WITH MR. KESLER)

12         Q.    Doctor Hayne, you earlier testified that you believe

13   Doctor West had done some special photographic techniques.  What

14   equipment did you see that Doctor--that West had present at the

15   autopsy to undertake these special photographic techniques that you

16   described?

17         A.    As I remember, there was the, uh, blue light set up.  I

18   don't remember the other aspects of it since I deferred to him, uh,

19   to conduct that--that part of the examination.

20         Q.    But you do recall that there was a blue light set up

21   there?

22.        A.    Uh, to my knowledge there was.

23         Q.    And you did incorporate in your official report that

24   special photographic techniques were used, is that correct?

25         A.    Yes, sir.

26                    BY MR. WALTERS:  No further questions, your Honor.

27                    BY THE COURT:  Redirect.

28                    BY MR. ALLGOOD:  Just a couple of questions, your

29              Honor.

1    REDIRECT EXAMINATION BY MR. ALLGOOD:

2    Q.    Doctor, you have been given a diagram which you prepared.

3          BY MR. ALLGOOD:   May I approach the witness, your

4    Honor?

5          BY THE COURT:   You may.

6    Q.    It has been marked Defendant's Exhibit Number 12 in

7    Evidence I believe.   This is a diagram you yourself prepared, is

8    that correct?

9    A.    Yes, sir.

10   Q.    Doctor, uh, are all of those I guess you'd say, for lack

11   of a better term, squiggly marks, uh, scratch marks, whatever, are

12   all of those indicative of areas you perceived to be bite marks or

13   are some of those areas also, uh, marking skin slippage, also

14   marking those defensive posturing wounds that we discussed, also

15   marking other types of injuries?

16   A.    There are multiple types of injuries identified on the,

17   uh, the schematic.   There is postmortem change, skin slippage, uh

18   there is also the presence of abrasions, and I describe those

19   abrasions in part consistent with defensive posturing injuries, but

20   also supportive of other types of injuries at different locations.

21   Q.    And so not all of that marking on that particular diagram

22   is supposed to indicate all of it bite marks, is it?

23   A.    No, sir.

24         BY MR. ALLGOOD:   If your Honor please, I have no

25         further questions of the doctor; however, I would ask

26         that the photographs which have been introduced through

27         his testimony be published to the jury.

28         BY THE COURT:   Is this witness finally discharged?

29         BY MR. ALLGOOD:   I would so ask, your Honor.   He has

1       another trial to testify in.

2               BY THE COURT:  Any objection?

3               BY MR. WALTERS:  No objection, your Honor.

4               BY THE COURT:  You are finally discharged, Doctor

5       Hayne.  You may go.

6    A. Thank you, your Honor.

7               BY THE COURT:  I will not publish the photographs

8       to the jury at this time because of the hour.

9               BY MR. ALLGOOD:  Yes, sir.

10              BY THE COURT:  Ladies and gentlemen, I'm going to

11      recess for the evening recess.  The bailiffs have

12      transportation prepared for you.  I believe that the

13      messages that you had sent out have already been

14      delivered to those that they were addressed to.  I will

15      remain here at the courthouse in the event you have any

16      questions for me, bailiffs, or concerns.  Please feel

17      free to call on me.  I'll remain at the courthouse until

18      you are ready to transport the jury to the motel for the

19      evening.  There will be no telephones at the motel rooms

20      that you stay in.  They have been removed from your

21      rooms.  In the event it is necessary for you to make a

22      telephone call, a bailiff must be present with you when

23      that call is made.  I understand that many of you have

24      relatives, loved ones, people at home that may wish to

25      speak with you about some matter or that you may wish to

26      convey to them personally; however, a bailiff must be

27      present when that call is made to make sure that there

28      is no outside contact from other persons concerning this

29      case with you.  Also, it has been my understanding that

1 for this evening and this evening alone, the television

2 sets have been removed by the management of the hotel

3 from your rooms.  I have made efforts to have those

4 reinstalled; they will be reinstalled tomorrow, but will

5 not be in your room tonight.  If there is any other

6 literatures, magazines, or things of that nature that you

7 wish, I will attempt to get those for you.

8   BY MR. ALLGOOD:  May we approach the bench on

9 something?

10   BY THE COURT:  You may.  Does this involve the jury

11 on further instructions?

12   BY MR. ALLGOOD:  Yes, sir, your Honor, it does.

13   (THE ATTORNEYS APPROACHED THE BENCH, ALONG WITH THE

14 COURT REPORTER, AND THE FOLLOWING OCCURRED OUT OF THE

15 HEARING OF THE JURY:)

16   BY MR. ALLGOOD:  If your Honor please, yesterday

17 we were informed by defense counsel that ABC News

18 intended to run a, uh, segment on Doctor Michael West

19 which was somewhat less than flattering.  Uh, this

20 segment was ostensibly supposed to run on 20/20 I

21 think which is supposed to be on this night, Tuesday

22 night, March twenty-first, nineteen hundred and

23 ninety-four.  Last night--ninety-five--excuse me--

24 last night, uh, my wife picked up the TV Guide and

25 it appears that 20/20 is going to air on Friday night,

26 not tonight.

27   BY MR. KESLER:  He's supposed to be on Peter

28 Jennings.  I don't know if that's the same thing.

29   BY MR. ALLGOOD:  I don't know.

1          BY THE COURT:  I had also since the defense

2     attorney brought that up checked my own scheduling of

3     TV programs and saw nothing other than a possibility

4     of a DNA program this evening.  In any event, out of

5     an abundance of caution the management had already

6     removed the television sets from their rooms--

7          BY MR. KESLER:  Your Honor--

8          BY THE COURT:  --for this evening.  I still

9     think that the Court can properly instruct this jury

10    and this jury will follow the Court's instructions.

11         BY MR. KESLER:  Your Honor--

12         BY THE COURT:  I have no reason to disbelieve

13    that.

14         BY MR. KESLER:  Let me say that an official of

15    ABC told me that so I was just trying to make sure.

16         BY THE COURT:  Anything further?

17         BY MR. ALLGOOD:  No, sir.

18         BY MR. KESLER:  I've got a couple of things I

19    want to take up after the jury is gone briefly.

20         BY THE COURT:  During this evening recess, please

21    do not discuss the case among yourselves; do not allow

22    anyone to speak to you about this case.  Should anyone

23    attempt to do so, report that immediately to one of

24    your bailiffs or to myself when you return to the

25    courtroom tomorrow morning.  We will begin testimony

26    at nine o'clock tomorrow morning.  Would you please

27    show the jury back into the jury room, please, at this

28    time.

29                    (JURY OUT)

1          BY THE COURT:  You had something further?  Keep

2      in mind that whatever you have will delay the departure

3      of the jury.

4          BY MR. KESLER:  I meant that I wanted to bring it

5      up after they were gone--

6          BY THE COURT:  Oh!

7          BY MR. KESLER:  --is what I was trying to say.

8          BY THE COURT:  Well I'm anticipating recessing now

9      and letting the bailiffs take care of that work.  Is

10     it something that needs to be on the record this

11     evening?

12         BY MR. KESLER:  Yes, sir.

13         BY THE COURT:  It cannot be placed on the record

14     tomorrow?

15         BY MR. KESLER:  I would like to do it this evening

16     because it involves some--

17         BY THE COURT:  Let's do it right now, right this

18     second.

19         BY MR. KESLER:  Your Honor, uh, two things.  Number

20     one, if the Court recalls various times in this case we

21     had asked and at one point obtained an order from the

22     Court about additional discovery from Doctor West.  None

23     of that discovery that we were given ever dealt with

24     this so-called blue light or alternate light source

25     imaging.  Quite frankly, I suspected it was involved in

26     this case.  There was never any production about it, and

27     it now appears from Doctor Hayne's testimony that there

28     was at least some attempt at this alternate light source

29     imaging being done, and for the Court's reference this

1    is what I believe to be the same procedure that was at

2    issue in the Maxwell case before Judge Roberts, and we

3    want a--a--a statement that there is no such; if there

4    was, we want it.

5         BY MR. ALLGOOD:  If your Honor--

6         BY MR. KESLER:  It's vital to the defense and the

7    cross examination of Doctor West.  If there's alternate

8    light source imaging either done and not revealed or

9    attempted and no results, we want to know about it.

10        BY MR. ALLGOOD:  If your Honor--

11        BY MR. KESLER:  The second thing that I'm trying

12   to bring up to the Court at this point is that

13   apparently based on the disclosure that was given to me

14   on Mr. Allgood's letterhead, and if you recall the bench

15   or not bench, but chambers conference about Gloria

16   Jackson and this statement that the district attorney,

17   uh, revealed to us as part of discovery that she gave

18   to the district attorney, to Mr. Allgood about this,

19   uh, jail house conversation that she purports, she has

20   now effectively denied giving the district attorney

21   that statement, and I am in the position and I want to

22   put the Court on notice and Mr. Allgood on notice of

23   either calling him or a member of his staff to get his

24   letter into evidence wherein he disclosed that discovery

25   to us and the details of it.

26        BY THE COURT:  Fine.  We're on notice as to that.

27   You may or may not be able to do that, but we are now

28   on notice.  Thank you.  Any response to whatever--

29        BY MR. ALLGOOD:  If your Honor please, the--

1          BY THE COURT:   --a blue light imaging is?

2          BY MR. ALLGOOD:   If your Honor please, I have no

3     knowledge--

4          BY MR. KESLER:   And yellow goggles of course.

5          BY MR. ALLGOOD:   --I have no knowledge of any

6     alternate light source imaging being done in this

7     particular case.  All the information I have seen has

8     been that it was not.  Uh, other than that paragraph--

9     that parenthetical in Doctor, uh, Hayne's report, I

10    have found nothing to indicate there was any such done.

11    Uh, if--if such comes to my knowledge I certainly

12    will provide it to defense counsel.  I--I think he

13    would certainly be entitled to it, and I will make

14    him aware of that just as soon as I am.  There is

15    one problem which I do need to think--I--I--I will

16    put on the record at this point briefly.  Doctor

17    Richard Souviron obtained the originals of the

18    models and the photographs and things of that

19    nature which Doctor West used to make his comparisons

20    as part of his, uh, necessary analysis in this

21    particular case.  On the Thursday preceding this

22    trial beginning on Monday I received a report from

23    Doctor Souviron.  This is not to--to castigate

24    defense counsel, that's not the point; uh, counsel

25    gave it to me or attempted to fax it to me at the

26    fax number I think five minutes after he got it and

27    got the wrong fax number, but it--

28          BY MR. KESLER:   Nine minutes and it was faxed

29    to the fax number published in the Mississippi Legal

1    Directory for this district attorney's office.

2    BY MR. ALLGOOD:  Yeah, it wasn't--it wasn't

3    defense counsel's fault; he got it I think on

4    Tuesday it was and he attempted to fax it to me on

5    Tuesday, and--and in any event--

6    BY THE COURT:  Let's cut to the chase, what's

7    the point?

8    BY MR. ALLGOOD:  Yes, sir.  The--the point is,

9    your Honor, that Doctor Souviron still has those

10   originals.  Doctor West is probably going to

11   testify tomorrow, and I ain't got them yet.  As I

12   understand, uh, the Court directed Doctor Souviron

13   to mail those back to us immediately.  Well we ain't

14   got them yet, and--and we're on the eve of Doctor

15   West's testimony and I'm somewhat in a predic--

16   predicament.

17   BY THE COURT:  Those are original physical

18   exhibits presently in the custody of a defense

19   expert who is supposed to appear and testify in this

20   case.  They were ordered returned by this Court.  The

21   State complains to the Court that it has not received

22   the physical exhibits from the defendant's expert.

23   I would assume that this Court might have to take up

24   the matter of how we go about addressing that problem

25   if you have to call your expert witness without those

26   physical exhibits.

27   BY MR. ALLGOOD:  Yes, sir.

28   BY MR. KESLER:  May I relate to the Court what I

29   know about this situation?

1    BY THE COURT: It's a convoluted story. As I

2    understand, one expert witness was allowed to be

3    appointed by this Court. That expert witness died

4    during the--or was killed in an untimely accident

5    before he could render any opinions or testify in

6    this case which necessitated defense counsel having

7    to obtain another expert. The estate of the first

8    expert witness did not know or could not surrender

9    the physical exhibits because they didn't know where

10   they were or what they were. When they were finally

11   located, they were in fact sent to the second

12   defense expert, Doctor Souviron.

13        BY MR. KESLER: Correction. They were returned

14   to the district attorney.

15        BY THE COURT: And then forward to the--

16        BY MR. KESLER: By Doctor Krauss's estate.

17        BY THE COURT: --forwarded to the--then forwarded

18   to the second expert.

19        BY MR. KESLER: By the district attorney per

20   court order.

21        BY THE COURT: They are now in the custody of

22   that second expert. It might be that, uh, there

23   might be some other matters that the Court can

24   address and other things the Court can do in the

25   event a defense expert appointed by this Court or

26   authorized--whose employment was authorized by this

27   Court does not timely surrender those items.

28        BY MR. ALLGOOD: I want to make the--

29        BY MR. KESLER: Your Honor--.

1          BY MR. ALLGOOD: --the record clear, your

2     Honor. I'm not trying to--to assert that defense

3     counsel has done anything untoward or done anything

4     improper or done anything that's trying--I--I--I

5     don't believe that. I don't think they have. The

6     problem apparently is with Doctor Souviron. We have

7     not gotten the exhibits back from Doctor Souviron.

8          BY THE COURT: When is he due here?

9          BY MR. KESLER: Thursday we believe, your Honor,

10    but may I add this: at Mr. Allgood's request, I

11    contacted Doctor Souviron on Friday, week last, and

12    told him that I needed him to ship that post-haste

13    back to the district attorney in the manner that it

14    was shipped to him. He said he would do that. I

15    have no reason to believe that he has not. Today I

16    attempted and--and again, both counsels are busy,

17    but I asked Mr. Allgood what the status was and had

18    his office call Doctor Souviron. I never got any

19    response.

20         BY THE COURT: How was it shipped? How was it

21    shipped down there to him?

22         BY MR. ALLGOOD: If your Honor please, I'm not

23    exactly sure.

24         BY THE COURT: Was it Fed-Ex?

25         BY MR. KESLER: Mr. Alderson did it.

26         BY MR. ALLGOOD: Mr. Alderson--

27         BY THE COURT: Overnight delivery; what--

28         BY MR. ALLGOOD: --investigator with this

29    office did the shipping down there. I'm not sure

1     how he shipped it.  I know Doctor Souviron received
2     it.  I know that we have not received it back yet.
3     That's what I know.  I'm informed by my paralegal
4     that it was Fed-Ex down there, your Honor, by Mr.
5     Alderson.

6         BY THE COURT:  Then if that's returned the same
7     way and he packaged it Friday, it should be here
8     yesterday.

9         BY MR. KESLER:  We will call him as soon as
10    we leave here or attempt to locate him at his home.
11    It--it'll be after seven P.M. in Miami.

12        BY THE COURT:  See what we can't find out
13    about it, gentlemen.

14        BY MR. KESLER:  Yes, sir, and we are not, and
15    I appreciate Mr. Allgood, we did not cause this.  If
16    the Court recalls, early in this case the Court
17    ordered that the district attorney would be
18    responsible for shipping their evidence.  The defense
19    never wanted to be in custody, and obviously that
20    evidence is as important to us as it is to Mr.
21    Allgood.

22        BY THE COURT:  Meanwhile keeping in mind that
23    this witness is a defense witness in this case who
24    presently has custody of this, the originals.  It
25    might be that the State can use copies, photographs--

26        BY MR. KESLER:  Certainly.

27        BY THE COURT:  --and secondary type evidence
28    because of the absence of the original.

29        BY MR. KESLER:  Your Honor, as a matter of fact,

1          as the Court authorized it, of course, we had some

2          additional dental models made last week and we have

3          supplied a set of those to the State as part of

4          discovery.

5               BY MR. ALLGOOD:  The only difficulty--

6               BY MR. KESLER:  And certainly--

7               BY MR. ALLGOOD:  I'm sorry.  I didn't mean--

8               BY MR. KESLER:  Certainly any other measures

9          that are going to be necessary or--

10              BY THE COURT:  Let's take--

11              BY MR. ALLGOOD:  The only diff--

12              BY THE COURT:  --that up if--if--if the

13         situation rears it ugly head, I will consider it

14         at that time, and it may be that the State can

15         use that secondary evidence.

16              Anything further--

17              BY MR. ALLGOOD:  No, your Honor.

18              BY THE COURT:  --before we recess?

19              BY MR. ALLGOOD:  No, your Honor.

20              BY THE COURT:  Court stands in recess till nine

21         o'clock tomorrow morning.  I will be in chambers if

22         you need to get in touch with me about anything.  I

23         might want to see you just a second before we do.

24                        (RECESS)

25                   * * * * * * * * * *

26         FOLLOWING THE OVERNIGHT RECESS, ALL MEMBERS OF THE COURT,

27    INCLUDING THE JUDGE, COURT REPORTER, ATTORNEYS, CLERK, BAILIFFS,

28    AND THE DEFENDANT BEING PRESENT, THE FOLLOWING PROCEEDINGS WERE HAD

29    ON WEDNESDAY, MARCH 22, 1995:

1           BY THE COURT:  Show the jury in, please.

2                        (JURY IN)

3           BY THE COURT:  Call your next witness, please.

4           BY MR. ALLGOOD:  If your Honor please, the State

5      would call Dewayne Graham.

6           BY THE COURT:  Swear the witness please, clerk.

7                     DEWAYNE GRAHAM,

8      upon being called to testify as a witness on behalf of the State,

9      after having been first duly sworn by Deputy Clerk, Lloyd Cobb,

10     testified as follows, to-wit:

11          BY THE COURT:  You may proceed.

12     DIRECT EXAMINATION BY MR. ALLGOOD:

13     Q.   Would you tell the ladies and gentlemen of the jury what

14     your name, please, sir?

15     A.   Uh, my name is Da--Dewayne Graham.

16     Q.   All right.  Mr. Graham, if I could get you to speak up,

17     please so the--

18     A.   Okay.

19     Q.   --jury can hear you.

20          BY THE COURT:  Raise that microphone up.  There

21          we go; speak into it.

22     (DEPUTY CLERK LEAVES COURTROOM TO TURN ON P.A. SYSTEM)

23          BY THE COURT:  You may proceed.

24          BY MR. ALLGOOD:  Thank you, your Honor.

25     Q.   One more time, would you state your name for the ladies

26     and gentlemen of the jury, please?

27     A.   Dewayne Graham.

28     Q.   Okay.  And where do you live, Mr. Graham?

29     A.   Starkville.